# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| Roland O' Neil Rabon as Special Administrator for the Estate of Kelli Kaufman Whitten, and as Personal Representative for the Estate of Anissa Kelley Henderson, <br><br>                               Plaintiffs, <br><br>     vs. <br><br> Sentinel Offender Services, LLC, Greenville County, and Greenville County Department of Public Safety, <br><br>                             Defendants. | Civil Action No. _____ <br><br><br> **COMPLAINT** <br> **(JURY TRIAL REQUESTED)** |

Plaintiffs, complaining of the Defendants, would respectfully show unto the Court as follows:

### PARTIES AND JURISDICTION

1. Plaintiff Roland O'Neil Rabon, Jr. ("Rabon") is the duly appointed Special Administrator for the Estate of Kelli Kaufman Whitten ("Decedent Whitten") and is a citizen and resident of Greenville County, South Carolina.

2. Rabon is also the duly appointed Personal Representative for the Estate of Anissa Kelley Henderson ("Decedent Henderson").

3. Authorized to do business in the State of South Carolina, Defendant Sentinel Offender Services, LLC ("Sentinel") exists under Delaware law as a limited liability company with a principal place of business in California. As a limited liability company, Sentinel's citizenship mirrors that of its members, which include the states of Delaware and California. Sentinel is not a citizen of South Carolina.

4. Defendant Greenville County ("County") exists as a political subdivision of the State of South Carolina as provided by South Carolina statutory and decisional law. In relation to the facts and circumstances set forth herein and at all times material to this dispute, the County acted and carried out its business by and through its agents, servants, and employees acting within the scope of their respective official duties at various locations in Greenville County, South Carolina.

5. Defendant Greenville County Department of Public Safety ("GCDPS") exists as a governmental agency and entity of the State of South Carolina as provided by South Carolina law. In relation to the facts and circumstances set forth herein and at all times material to this dispute, GCDPS acted and carried out its business by and through its agents, servants, and employees acting within the scope of their respective official duties at various locations in Greenville County, South Carolina.

6. GCDPS operates the Greenville County Detention Center which established and operates the Home Incarceration Program ("HIP") and Electronic Monitoring Program ("EMP") for court-approved inmates as an alternative to incarceration.

7. The actions, inactions, policies and events set forth more fully in this Complaint, which were undertaken by the agents, servants, employees, and assigns of Defendants, are the responsibility of Defendants as though Defendants had personally committed each of the complained-of acts themselves.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1332, and 1367 as Plaintiffs' causes of action arise under the Constitution and laws of the United States, including

but not limited to the Fourth and Fourteenth Amendments to the Constitution of the United States.

9. In addition to other causes of actions, there is an action for money damages and relief brought pursuant to 42 U.S.C.A. § 1983, and the Fourth and Fourteenth Amendments to the Constitution of the United States. Plaintiffs similarly seek the award of attorneys' fees pursuant to 42 U.S.C.A. § 1988.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: Defendants County and GCDPS exist and reside in this jurisdiction, while most or all of the events and omissions giving rise to Plaintiffs' claims likewise occurred in this judicial district.

## FACTS

11. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

12. As an alternative to incarceration in the Greenville County Detention Center, the County and GCDPS established the HIP and EMP programs, along with the applicable policies and procedures governing those programs. Their authority to operate such programs derives from South Carolina Code, along with an Administrative Order from the Thirteenth Judicial Circuit Court.

13. In July 2020 and as thereafter renewed from year to year, the County, acting in tandem with GCDPS, contracted with Sentinel to provide professional HIP and EMP services ("County Contract").

14. Pursuant to the County Contract, Sentinel expressly agreed and undertook the following obligations:

a) To furnish house arrest monitoring and inmate supervision services ("Services") in a manner consistent with the care and skill ordinarily and customarily exercised by other companies in the same industry or providing similar services as Sentinel;

b) To furnish Services in a manner free from defects; and

c) To furnish Services in a manner adherent to all applicable federal, state, local laws, regulations, codes, standards promulgated by the South Carolina Law Enforcement Division ("SLED"), licensing requirements, and court orders in effect at the time Sentinel furnished such Services.

15. On January 16 and 17, 2024, Sentinel was providing HIP and EMP Services to and on behalf of the County and GCDPS, having expressly undertaken the duty to provide such Services in a manner consistent with all standards and duties of care set forth in its contract with Greenville County, South Carolina, all applicable statutory law, all applicable regulations, the common law, SLED's standards, licensing requirements, and any governing Administrative Order of the Thirteenth Judicial Circuit.

16. South Carolina Code § 17-15-37 further requires SLED to approve electronic monitoring companies and establishes certain minimum standards of care and duties for such companies:

> **SECTION 17-15-37** Regulations regarding electronic monitoring by SLED; electronic monitoring agency requirements.
>
> (A) The South Carolina Law Enforcement Division may promulgate regulations to effectuate the intent of Section 17-15-35 and this section, develop standards for the use and approval of active electronic monitoring devices, and shall certify electronic monitoring agencies, including law enforcement agencies, electronic monitoring companies, and bondsmen and bonding companies. SLED must keep a public list of those companies that are certified.
>
> (B) The approved electronic monitoring agency must:
>
> (1) provide active electronic monitoring devices or mobile phone applications approved by SLED that must provide verifiable identity and location

4

information at regular and random intervals throughout the day, and that timely record and report the person's presence near or within a prohibited area or the person's departure from a specified geographic location;

(2) allow any law enforcement agency, including the prosecutor's office, to have access to real-time monitoring, if possible, and any reports requested by law enforcement or the prosecution must be provided within twenty-four hours of the request;

(3) notify the Solicitor's Office having jurisdiction over the participant and the bondsman within forty-eight hours when he becomes aware or should have become aware that the participant has violated any provision of the court's order for electronic monitoring, or the participant has been surrendered to the custody of law enforcement; and

(4) *immediately notify local law enforcement and make reasonable attempts to immediately notify the victim if the participant violates any exclusion zones related to the victim*. (Emphasis added.)

(C) Failure of the electronic monitoring agency to maintain compliance with regulations established by SLED, the order of the court, or any applicable statute shall be reported to SLED by the solicitor for administrative action. SLED may impose a fine or suspend or revoke the certification for any approved agency who demonstrates a failure to maintain the standards and reporting requirements set forth under the regulations and appropriate statutes.

17. Pursuant to the authority conferred upon SLED under S.C. Code § 17-15-37(A), the agency developed standards governing electronic monitoring companies such as Sentinel. In pertinent part, those standards include:

a) An acknowledgment under oath by Sentinel that it will: "provide active electronic monitoring devices approved by SLED that must provide verifiable identity and location information at regular and random intervals throughout the day, and that timely record and report the person's presence near or within a prohibited area or the person's departure from a specified geographic location (as applicable pursuant to the court order)." (SLED Standards, 11.01.23, p. 3, ¶ 7(a).)

b) An acknowledgment under oath by Sentinel that it will: "immediately notify local law enforcement and the prosecutor having jurisdiction over the participant and make reasonable attempts to immediately notify the victim if the participant violates any exclusion zones related to the victim." (*Id.* at ¶ 7(d).)

c) An acknowledgment under oath by Sentinel that it will: "comply with all requirements of the court order, including electronic monitoring as a pretrial release condition and all

requirements of the applicable South Carolina laws and regulations, and all standards mandated by SLED." (*Id.* at ¶ 7(e).)

d) "Each applicant must demonstrate to SLED that the applicant, and all employees, can perform all of the above requirements and that the applicant and all employees have the requisite training, background, and experience to successfully monitor electronic monitoring participants in a manner that promotes public safety and protects crime victims in South Carolina."  (*Id.* at ¶ 8.)

e) "An electronic monitoring agency must at all times: provide active electronic monitoring devices approved by SLED that must provide verifiable identity and location information at regular and random intervals throughout the day, and that timely record and report the person's presence near or within a prohibited area or the person's departure from a specified geographic location (as applicable pursuant to the court order)." (*Id.* at ¶ 13(a).)

f) "An electronic monitoring agency must at all times: immediately notify local law enforcement and the prosecutor having jurisdiction over the participant and make reasonable attempts to immediately notify the victim if the participant violates any exclusion zones related to the victim." (*Id.* at ¶ 13(d).)

g) "An electronic monitoring agency must at all times: comply with all requirements of the court order, including electronic monitoring as a pretrial release condition and all requirements of the applicable South Carolina laws and regulations, and all standards mandated by SLED." (*Id.* at ¶ 13(e).)

h) "An electronic monitoring agency shall, at all times have: enough employees on duty so that the number of individuals being monitored does not pose a threat to public safety, but not less than one employee on duty and one on call and available twenty-four hours a day, seven days a week." (*Id.* at p. 10, ¶ 4(a).)

i) "An electronic monitoring agency shall, at all times have: in-person contact with a participant as ordered by the court."  (*Id.* at p. 10, ¶ 4(b).)

j) "An electronic monitoring agency shall, at all times have: the capability to provide immediate notification to the local law enforcement agency, and the capability to provide all required notifications to the court or to the appropriate prosecutor within the required timeframes."  (*Id.* at p. 10, ¶ 4(e).)

18. S.C. Code § 17-15-35(B)(1) also specifically authorizes the judge presiding over a bond hearing to place a criminal defendant on surveillance *via* an approved active electronic monitoring device furnished by Sentinel whenever the Court determines "sufficient evidence of a concern for the victim's safety or the safety of any member of the public exists…."

19. In conformity with the Home Detention Act (S.C. Code § 24-13-1520 *et seq*.), the Bail and Recognizances Act (S.C. Code § 17-215-10 *et seq*.), and GCDPS policies and procedures, the HIP and EMP Services provided by Sentinel generally tracked the following process as of January 16 and 17, 2024:

a) A bond order signed by a judge would establish electronic monitoring services as a condition of release for a defendant. If the court determines through its analysis that the defendant is a potential danger to the victim or other specific individuals, the bond would establish a provision whereby the defendant must not have any contact with a specific victim or specified individuals.

b) Sentinel would enter into a contract with the criminal defendant whereby the criminal defendant would pay Sentinel a monthly fee and in return Sentinel would provide and place an electronic monitor on the criminal defendant's person. The electronic monitor utilizes Global Positioning System (GPS) location technology whereby Sentinel monitors the defendant's location at all times.

c) As part of Sentinel's technological capabilities, it is required pursuant to the bond order to create a protective zone, referred to as the "exclusionary zone" and commonly called the "Red Zone," around a specific address. Sentinel then identifies and explains the "Red Zone" to the defendant.

d) Sentinel possesses and utilizes GPS technology to assign a specific geographic protected area to a particular defendant's electronic monitor. This exclusionary zone is a fixed geographic protected area surrounding a specified address whereby Sentinel would be immediately notified if a defendant wearing an electronic monitor entered the particular exclusionary zone.

20. The whole purpose of the exclusionary zone is to create a safety barrier around a given geographic protected area to deter a criminal defendant from entering the proscribed area thereby creating an additional layer of protection for the victim, along with the victim's friends and family, who may be found within the exclusionary zone due to their relationships to and interactions with the victim.

21. If a defendant who is on electronic monitoring enters into an exclusionary zone, Sentinel, through its employees, is immediately electronically notified of the violation.

22. In addition to what is ordinary and customary in the industry, Sentinel is also both contractually and statutorily required to (a) notify the criminal defendant that he or she has entered the exclusionary zone, (b) notify the victim that the defendant has entered the exclusionary zone, and (c) notify law enforcement and the Solicitor's Office that the defendant has entered the exclusionary zone.

23. On December 22, 2023, Gary Pratt Whitten ("Gary Whitten") was arrested in Greenville County for the following crimes:

   - Warrant Number 2023A2330211374 Domestic Violence of a High and Aggravated Nature;

   - Warrant Number 2023A2330211375 Possession of a Weapon during the Commission of a Violent Crime; and

   - Warrant Number 2023A2330211378 Possession of a Weapon by a Person Convicted of a Violent Felony.

24. Notably, Gary Whitten had been previously convicted of high and aggravated assault and battery in 2009.

25. According to public records concerning the incident on December 22, 2023, Gary Whitten reportedly suffered from paranoid schizophrenia and believed if he killed someone, he could resurrect them.

26. On December 22, 2023, while unlawfully brandishing a revolver, Gary Whitten allegedly threatened to cut off the face of his girlfriend (victim in the 2023 case Anissa Henderson) and kill her. At that time, Gary Whitten lived with Henderson at 10 Millbrooke Circle in Greenville, South Carolina.

27. A SWAT Team from the Greenville County Sheriff's Department eventually had to remove Gary Whitten from a back bathroom in the 10 Millbrooke Circle residence, where they also found his revolver hidden in a trash can.

28. Gary Whitten was thereafter arraigned, and a bond was set in an aggregate amount of one hundred and fifty thousand dollars and no cents ($150,000.00).

29. Finding sufficient evidence existed to be concerned about the safety of Anissa Henderson, along with any other occupants of 10 Millbrooke Circle, the presiding judge specifically imposed the following conditions in Gary Whitten's Bond Order (dated January 12, 2024):

> GPS w/exclusionary zones around victim's residence at 10 Millbrooke Circle, no contact with Victim Directly/Indirectly, Must not Possess Firearms or Any Weapons While on Bond.

30. Gary Whitten posted the bond through a surety on January 12, 2024.

31. As a result of his posting bond, Gary Whitten and Sentinel executed an agreement whereby an electronic monitor was placed on Gary Whitten and an exclusionary zone with an approximate one-mile perimeter was established around 10 Millbrooke Circle.

32. Upon executing the monitoring agreement, Sentinel was further required to obtain documentation from Gary Whitten acknowledging that: he was informed and knew about the exclusionary zone; his violation of the exclusionary zone would violate the Bond Order; he agreed to wear an approved device to verify his compliance with the Bond Order's terms and conditions; he was responsible for maintaining the monitoring device in working order; he

agreed to abide by Sentinel's approved terms and conditions; and he would notify Sentinel and the Court of any change to his address, phone number, or contact information.

33. Upon information and belief, Sentinel never obtained documentation from Gary Whitten fully satisfying the foregoing requirements.

34. As of January 16, 2024, Decedent Plaintiff, Kelli Whitten,[1] had maintained a bedroom at the 10 Millbrooke Circle residence and was residing with Anissa Henderson at that location.

35. On January 16, Gary Whitten was required to meet at the Greenville Sentinel Office pursuant to a previously scheduled time to review Sentinel documentation, review the monitoring device rules and regulations, and review the exclusionary zone surrounding the residence of Anissa Henderson and Kelli Whitten. Gary Whitten did not show up at the predetermined time of 9:00 a.m. and as a result, Sentinel attempted to call Gary Whitten at an incorrect phone number and the individual that answered the call stated, "wrong number."

36. At approximately 4:15 p.m. on January 16, 2024, Gary Whitten arrived at the Sentinel Office ostensibly to review and sign documentation, review EMP rules and regulations, and review the exclusionary zone location. At this meeting and upon information and belief, Sentinel did not address the previous violation of not arriving at the predetermined 9:00 a.m. time slot nor did it address Sentinel's previous phone call attempt to Gary Whitten to the incorrect number whereby such individual specifically informed Sentinel that it was the "wrong number." Failure to maintain Gary Whitten's phone number violates Sentinel's own policies since Sentinel was obligated to contact Whitten if he ever entered the exclusionary zone.

37. Sentinel's exclusionary zone notification policies and procedures, as then in-effect, were authorized, approved, and required by the GCDPS and County. Those policies detail Sentinel's

---

[1] Kelli Kaufman Whitten was the mother of Gary Pratt Whitten.

obligations when a prohibited individual enters an exclusionary zone. The notification policies of GCDPS, County and Sentinel are as follows:

  a) Upon a participant entering the exclusionary zone, document current location with time and date and input notes.
  b) If not clear, call participant to instruct to leave the area immediately and input detailed notes of call outcome.
  c) If exclusionary zone is a victim zone, call victim's cell number and if victim states they are safe, input notes, and select CLOSE. If victim states they are not safe, refer to script and then input notes and select continue. If no answer, leave a voice mail using script. If unsuccessful in contacting the victim and cell and home the first time, make a second attempt using script. If victim is safe, input notes, and select CLOSE.
  d) If victim did not answer to state they were safe, call the Greenville County Sheriff's Office at 864-271-XXXX (the non-emergency number) and inform them that you are requesting a well-being check on a Victim since you were unable to validate their safety. Then provide Victim's address and contact information. If no answer, leave a voicemail. Input details of call outcome, then select CLOSE.

38. Contrary to and in violation of South Carolina Code § 17-15-37 and SLED's compulsory regulations, the GCDPS and County policy then in effect did require Sentinel to call law enforcement or 911 when a prohibited person enters a victim's exclusionary zone, even though Sentinel had contractually undertaken a specific obligation to fulfill all of its HIP and EMP services in conformity with South Carolina law.

39. Plaintiffs are informed and believe the policies of GCDPS and County, in fact, directed that Sentinel NOT call law enforcement upon the entry of a prohibited person into an exclusionary zone in violation of South Carolina Code § 17-15-37 and authorized SLED regulations.

40. On January 16, 2024, after leaving the Sentinel Office, Gary Whitten immediately traveled to Kaufman and Henderson's home and violated the exclusionary zone by crossing the outer perimeter and circling the residence at 10 Millbrooke Circle at approximately 5:17 p.m.

41. Both Anissa Henderson and Kelli Whitten were at 10 Millbrooke Circle when Gary Whitten violated the Bond Order's terms.

42. Pursuant to GCDPS's Standard Operating Procedures, Sentinel, by and through its employees, was required but never actually contacted Gary Whitten to notify him of his violation of the Bond Order by virtue of his entering the exclusionary zone. Sentinel negligently failed to maintain Gary Whitten's cell phone number, despite meeting with him less than 15 minutes earlier. Sentinel attempted to contact Gary Whitten at the incorrect number and received the same response from the individual "wrong number."

43. As of January 16, 2024, the Standard Operating Procedures imposed by the County and GCDPS upon Sentinel were outdated, in violation of State law, in violation of SLED regulations and legislatively stale.

44. Pursuant to the outdated Standard Operating Procedures imposed by the County and GCDPS, Sentinel is believed to have phoned Anissa Henderson just as Gary Whitten first entered the exclusionary zone but before he had actually arrived at the house.

45. This single telephone call constituted Sentinel's sole attempt to contact Anissa Henderson despite the fact Gary Whitten remained in violation of the Court-ordered exclusionary zone for over 20-hours during which time Sentinel thereafter received thousands of periodic alerts notifying it that Gary Whitten had violated the mandatory Court Order governing his release by remaining in the exclusionary zone.

46. To make matters worse, Sentinel never telephoned law enforcement on either January 16 or January 17, 2024 about Gary Whitten's patent violations of the Bond Order's exclusionary zone despite the clear and present danger he posed to both Kaufman and Henderson.

47. Despite its legal obligation to do so, Sentinel also never telephoned the Solicitor's Office on January 16 or January 17, 2024 about Gary Whitten's violations of the Bond Order's exclusionary zone.

48. On January 17, 2024, a neighbor residing at 100 Millbrooke Circle reported a fire at 10 Millbrooke Circle to the Greenville County Fire Department.

49. At approximately 1:34 p.m. that day, ***20 hours after Gary Whitten first breached the exclusionary zone***, Sentinel received a monitoring device tamper alert regarding Gary Whitten's electronic device and then and ***only then*** did Sentinel notify the Greenville County Sheriff's Office that Gary Whitten had violated the Court's Order by entering the exclusionary zone.

50. Despite its obligation to do so, Sentinel never thereafter notified the Solicitor's Office of Gary Whitten's violation of the exclusionary zone.

51. At approximately 1:55 p.m. that day, deputies with the Greenville County Sheriff's Office entered 10 Millbrooke Circle and discovered the bodies of Kelli Whitten and Anissa Henderson, both of whom had been tortured, brutally beaten with an axe and a hammer, and set on fire by Gary Whitten, eventually succumbing to smoke inhalation.

52. While searching a shed behind the residence at 10 Millbrooke Circle, deputies found the electronic monitor of Gary Whitten that he had unlawfully removed.

53. Plaintiffs are informed and believe Sentinel had a duty to operate its electronic monitoring company and monitor exclusionary zones consistent with duties arising by: contract, statutes, industry customs, SLED standards, GCDPS Standard Operating Procedures, the Bond Order, the duties and obligations it voluntarily undertook, and the common law of South Carolina.

## **FOR A FIRST CAUSE OF ACTION**

### **(As to GCDPS and Greenville County: Violation of the United States Constitution, The South Carolina Constitution, and 42 U.S.C. § 1983)**

54. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

55. GCDPS and County were at all times acting under color of State law having been authorized by South Carolina law, State Regulations and Court Orders to establish, conduct, and contract for the execution of the EMP program for Greenville County.

56. GCDPDS and County were aware of South Carolina law and regulations requiring it or its agents to immediately notify law enforcement and the Solicitor's Office when Whitten entered the exclusionary zone.

57. GCDPS and County established a specific policy and directed Sentinel to NOT call law enforcement or the Solicitor's Office when Whitten entered the exclusionary zone.

58. GCDPS and County violated their duties required by State law imposed on them with regard to plaintiffs' constitutional rights as set forth herein and such violations and failures proximately caused injuries, damages and the death of Decedent Plaintiffs Kelli Whitten and Anissa Henderson. GCDPS and County's actions resulted in the deprivation of Decedent Plaintiffs' constitutional rights by their willful, callous indifference and reckless actions by:

    a) Creating and implementing policies in procedures in violation of South Carolina law and regulations

    b) Failing to review the policies and procedures of Sentinel and ensure they remained compliant with applicable law;

    c) Approving and imposing outdated, improper and illegal policies and procedures upon Sentinel;

    d) Failing to ensure Sentinel satisfied its contractual obligations relative to furnishing Services in a manner that would protect Kelli Whitten and Anissa Henderson and comply with South Carolina law and applicable regulations;

    e) Failing to ensure Sentinel maintained proper staffing and training; and

14

f) Such other matters as may be discovered in discovery in this case.

59. The incident set forth above and Decedent Plaintiffs' resulting injuries and damages were proximately caused by GCDPS and County's violations of the Decedent Plaintiffs' clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to the right to due process protecting life and liberty with due process of law and the right to be free from state-created danger.

60. Plaintiffs are entitled to and pray for an award of damages for the conscious pain and suffering and ultimate death experienced by Decedent Plaintiffs Kelli Whitten and Anissa Henderson, and an award of punitive damages in an amount deemed sufficient by a jury to impress upon the Defendants the seriousness of their conduct and to deter similar conduct in the future.


## FOR A SECOND CAUSE OF ACTION

### (As to Sentinel: Violation of the United States Constitution, The South Carolina Constitution, and 42 U.S.C. § 1983)

61. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

62. GCDPS and County in accordance with South Carolina law and regulations contracted and delegated to Sentinel the authority to provide electronic monitoring such services thereby engaging in the functional equivalent of a public function.

63. The monitoring of individuals who are on EM is traditionally the exclusive prerogative of the County and GCDPS.

64. Sentinel was at all times acting under color of State law having been authorized by GCDPS and County to establish, conduct, and contract for the execution of the EMP program for Greenville County.

15

65. Sentinel was aware of South Carolina law and regulations requiring it or its agents to immediately notify law enforcement and the Solicitor's Office when Whitten entered the exclusionary zone.

66. At the direction of GCDPS and County, Sentinel established a specific policy and procedure to NOT call law enforcement or the Solicitor's Office when Whitten entered the exclusionary zone.

67. Sentinel violated their duties required by State law imposed on them with regard to plaintiffs' constitutional rights as set forth herein and such violations and failures proximately caused injuries, damages and the death of Decedent Plaintiffs Kelli Whitten and Anissa Henderson. GCDPS and County's actions resulted in the deprivation of Decedent Plaintiffs' constitutional rights by their willful, callous indifference and reckless actions by:

    a) Implementing policies and procedures in violation of South Carolina law and regulations;

    b) Approving and imposing outdated, improper and illegal policies and procedures in the execution of Services;

    c) Sentinel violated its contractual obligations relative to furnishing Services in a manner that would protect Kelli Whitten and Anissa Henderson and comply with South Carolina law and applicable regulations;

    d) Sentinel failed to maintain proper staffing and training; and

    e) Such other matters as may be discovered in discovery in this case.

68. The incident set forth above and Decedent Plaintiffs' resulting injuries and damages were proximately caused by GCDPS and County's violations of the Decedent Plaintiffs' clearly established rights under the Fourth and Fourteenth Amendments to the United States

Constitution, including but not limited to the right to due process protecting life and liberty with due process of law and the right to be free from state-created danger.

69. Plaintiffs are entitled to and pray for an award of damages for the conscious pain and suffering; and ultimate death experienced by Decedent Plaintiffs Kelli Whitten and Anissa Henderson, and an award of punitive damages in an amount deemed sufficient by a jury to impress upon the Defendants the seriousness of their conduct and to deter similar conduct in the future.

### FOR A THIRD CAUSE OF ACTION
**(Negligence/As to All Defendants)**

70. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

### Count I
**(Greenville County/GCDPS)**

71. The County and GCDPS owed a common law duty of care to Plaintiffs to ensure electronic monitoring services were furnished in a manner consistent with the standard of care applicable to companies offering the same services as Sentinel; such duty was nondelegable.

72. Defendants, the County and GCDPS, had a statutory duty to ensure electronic monitoring services were provided in a manner compliant with applicable statutes, as set forth above, their own policies and procedures, the standards promulgated and imposed by SLED, and the terms and conditions imposed by the Court's Order; such duty was nondelegable.

73. The County and GCDPS breached the duties they owed to Plaintiffs by:

    a) Failing to review the policies and procedures of Sentinel and ensure they remained compliant with applicable law;

    b) Continuing to approve and impose outdated and improper policies and procedures upon Sentinel;

c) Failing to ensure Sentinel satisfied its contractual obligations relative to furnishing Services in a manner that would protect Kelli Whitten and Anissa Henderson;

d) Failing to ensure Sentinel maintained proper staffing and training; and

e) Such other matters as may be discovered in discovery in this case.

74. The acts and omissions of the County and GCDPS were grossly negligent and exhibited a wanton disregard of the rights of Kelly Whitten and Anissa Henderson.

75. Kelli Whitten and Anissa Henderson lost their lives as a factual and proximate result of the breaches of the standard of care owed and undertaken by the County and GCDPS.

76. Plaintiffs are entitled to recover all available damages caused by the gross negligence of the County and GCDPS.

**Count II**
**(Sentinel)**

77. Sentinel owed Plaintiffs duties of care arising from: Sentinel's agreement to undertake the obligation of providing electronic monitoring services on behalf of the County and GCDPS, by applicable statutes as outlined above, pursuant to the common law, pursuant to the standard of care applicable to companies furnishing electronic monitoring services, pursuant to the policies and procedures approved by and imposed by the County and GCDPS, the contract executed between Sentinel and the County and GCDPS, the terms and conditions of the Bond Order, and the Regulations and Standards promulgated and imposed by SLED pursuant to S.C. Code § 17-15-37.

78. Sentinel breached the duties it owed to Plaintiffs in the following ways:

(a) By failing to notify law enforcement immediately when Gary Whitten violated his bond by entering the exclusionary zone;

(b) By failing to notify the Solicitor's Office immediately when Gary Whitten violated his bond by entering the exclusionary zone;

(c) By failing to again contact Anissa Henderson after calling her upon receiving the first electronic signal that Gary Whitten had entered the exclusionary zone;

(d) By failing to monitor Gary Whitten's exclusionary zone violations at specified intervals and reporting his noncompliance immediately upon learning of the continuation of those violations;

(e) By failing to train its employees properly to ensure their compliance with South Carolina statutory provisions and SLED's standards;

(f) By failing to supervise its employees properly to ensure their compliance with South Carolina statutory provisions and SLED's standards;

(g) By failing to furnish Services in a manner free from defects;

(h) By failing to furnish Services in a manner adherent to all applicable federal, state, local laws, regulations, codes, SLED standards, the Bond Order, and licensing requirements;

(i) By failing to contact Gary Whitten to notify him of his exclusionary zone violations;

(j) By failing to maintain adequate documentation with Gary Whitten;

(k) By failing to have appropriate in-person contact with Gary Whitten as required by the Court;

(l) By failing to maintain the capability to provide immediate notifications to local law enforcement and the Solicitor's Office following Gary Whitten's numerous and continuing infractions;

(m) By failing to maintain an adequate workforce;

(n) By failing to maintain organizational control;

(o) By failing to implement appropriate standard operating procedures to ensure compliance with applicable law; and

(p) By failing to prevent Gary Whitten from contacting Anissa Henderson.

79. Sentinel's breach of the duties of care owed to Plaintiffs factually and legally resulted in the 20 hours of torture and ultimately the deaths of Kelli Whitten and Anissa Henderson at the hand of Gary Whitten.

80. Plaintiffs have sustained significant actual losses.

81. Sentinel's conduct, as outlined above, was intentional, willful, wanton, and conducted with reckless disregard of Plaintiffs' rights entitling them to an award of punitive damages pursuant to S.C. Code § 15-5-90 in an amount to be determined by a jury.

### FOR A FOURTH CAUSE OF ACTION
**(Survival Action/As to All Defendants)**

82. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

83. Kelli Whitten and Anissa Henderson were tortured for nearly 20 hours before Gary Whitten brutally murdered Decedent Plaintiffs and setting them and the house around them on fire.

84. The injuries and ultimate deaths of Kelli Whitten and Anissa Henderson were directly caused, factually caused, and proximately caused by the acts and omissions of Defendants as set forth above.

85. As a direct and proximate result of the acts and omissions of Defendants, the Estates of Decedents Whitten and Handerson have incurred expenses in the form of funeral and burial expenses.

86. During the 20 hours leading up to their deaths, Gary Whitten brutally tortured Kelli Whitten and Anissa Henderson with an axe and hammer.  Kelli Whitten and Anissa Henderson then

succumbed to smoke inhalation caused by Gary Whitten's ignition of two separate fires in the home located at 10 Millbrooke Circle.

87. Decedent Plaintiffs suffered extreme fear and extreme conscious pain and suffering as they were slowly and systematically tortured to death for 20 consecutive hours.

88. The Estates of Decedent Plaintiffs are entitled to an award of actual and punitive damages pursuant to S.C. Code § 15-5-90 in an amount to be determined by a jury.

## FOR A FIFTH CAUSE OF ACTION
**(Wrongful Death/As to All Defendants)**

89. The prior allegations, to the extent not inconsistent, are incorporated herein by reference.

90. Kelli Whitten and Anissa Henderson were tortured for nearly 20 hours before Gary Whitten brutally murdered them and set their house on fire around them.

91. The injuries and ultimate deaths of Kelli Whitten and Anissa Henderson were directly caused, factually caused, and proximately caused by the acts and omissions of Defendants as set forth above.

92. As a result of the deaths of Decedent Plaintiffs, their statutory beneficiaries have lost the financial and emotional support they could and would have provided and have suffered severe and extreme emotional distress, anxiety, grief, and sorrow, for which Plaintiffs are entitled to recover actual and punitive damages on behalf of their statutory beneficiaries pursuant to S.C. Code § 15-51-10, *et seq.* in an amount to be determined by a jury.

**WHEREFORE**, Plaintiffs pray for the following relief against Defendants:

A. An award of actual damages against all Defendants in an amount to be determined by a jury;

B. An award of punitive damages against all Defendants in an amount to be determined by a jury;

**C.** An award of all costs, including attorneys' fees, against all Defendants; and

**D.** Such other relief as this Court deems just and proper.

**WILKINS DAVIS, LLC**

/s/   *W. Walter Wilkins, III*
Lane W. Davis (Federal Bar No. 7739)
W. Walter Wilkins, III (Federal Bar No. 7726)
William W. Wilkins, Jr. (Federal Bar No. 4662)
Lane@wilkinsdavis.com
Walt@wilkinsdavis.com
Billy@wilkinsdavis.com
206 Mills Avenue
Greenville, SC  29605
Telephone (864) 263-3155
ATTORNEYS FOR PLAINTIFFS

**ELLIS HINTON, LLC**

Sloan P. Ellis (Federal Bar No. 10436)
Brandi B. Hinton (Federal Bar No. 13186)
sloan@ellishinton.com
brandi@ellishinton.com
21 Augusta Street, Suite C
Greenville, SC 29601
Telephone (864) 775-5775

*Attorneys for Plaintiffs Whitten and Henderson*

**McCRAVY NEWLON CLARDY
LAW FIRM P.A.**

John R. McCravy, III (Federal Bar No. 2781)
Jon E. Newlon (Federal Bar No. 7332)
jmccravyiii@mccravylaw.com
jnewlon@mccravylaw.com
1629 Bypass 72 NE
Greenwood, SC 29649
Telephone (864) 775-5775

*Attorney for Plaintiff Whitten*

January 13, 2026
Greenville, South Carolina